UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UNITED STATES OF AMERICA,

v.                                                              Case No: 8:23-cr-0010-KKM-JSS-1

JOSE DAVID PAYBA LACAYO,

     Defendant.

_____

## ORDER

The U.S. Coast Guard discovered Jose David Payba Lacayo and his two codefendants transporting marijuana on a go-fast vessel. A grand jury subsequently indicted Defendants with possession of and intent to distribute a Schedule I controlled substance in violation of the Maritime Drug Law Enforcement Act (MDLEA), 46 U.S.C. § 70501 *et seq. See* Indictment (Doc. 1). The grand jury also indicted Defendants with aiding and abetting one another. *Id.*

As is common in these drug interdiction cases, the United States alleges that Defendants' vessel is subject to the jurisdiction of the United States under 46 U.S.C. § 70502(c)(1) as a stateless vessel on the high seas. *See* Certification of Commander Starr (Doc. 32-1). Payba Lacayo moves to dismiss the indictment for lack of jurisdiction, arguing that 46 U.S.C. § 70502(d)(1)(C) is unconstitutional—both facially and as-applied—

because Congress exceeded its power under the Felonies Clause, U.S. CONST. art. I, § 8, cl. 10. Second Am. Mot. to Dismiss (Doc. 47). Because neither of Payba Lacayo's arguments are meritorious, his motion to dismiss is denied.

## I.   BACKGROUND

On or about December 25, 2022, the U.S. Coast Guard discovered Payba Lacayo and his two codefendants operating a go-fast vessel in the Pacific Ocean—roughly 135 nautical miles northwest of Isla de Malpelo, Colombia. Certification of Commander Starr ¶ 4; Second Am. Mot. to Dismiss at 2. Coast Guard officials observed Defendants transporting several packages, operating without navigational lights, and throwing packages overboard. Certification of Commander Starr ¶ 4. U.S. law enforcement fired warning shots, which temporarily compelled Defendants to stop their vessel. *Id.* But Defendant later attempted to escape, and U.S. law enforcement utilized disabling fire to stop Defendants' vessel. *Id.*

Although Defendants' vessel displayed no indicia of nationality, Payba Lacayo identified himself as the master of the vessel and claimed that the vessel was of Costa Rican nationality. *Id.* The United States requested that the Government of Costa Rica confirm the claim of nationality, *id.* ¶ 5, but Costa Rica replied that it could neither confirm nor deny the vessel's registry or nationality. *Id.* ¶ 6. Additionally, U.S. law enforcement officials discovered no other evidence of the vessel's nationality or registry after they boarded the

vessel. *Id.* ¶ 7. The U.S. Coast Guard then arrested Defendants and seized approximately 4,020 pounds of marijuana onboard their vessel. Certification of Commander Starr ¶ 9; Second Am. Mot. to Dismiss at 2.

On January 10, 2023, the United States filed the grand jury's indictment in open court. *See* Indictment. The grand jury charged Defendants with possession with intent to distribute a Schedule I controlled substance in violation of 46 U.S.C. §§ 70503(a), 70506(a)–(b), *see* Indictment at 1, and with aiding and abetting one another in violation of 46 U.S.C. §§ 70503(a), 70506(a) and 18 U.S.C. § 2. *See* Indictment at 2. Payba Lacayo moves to dismiss the indictment on jurisdictional grounds, arguing that Congress lacks the authority under the Felonies Clause to enact 46 U.S.C. § 70502(d)(1)(C). *See generally* Second Am. Mot. to Dismiss. Payba Lacayo raises both a facial and an as-applied challenge. The United States contends that § 70502(d)(1)(C) is a constitutional exercise of Congress's authority. *See generally* Resp. to Second Am. Mot. to Dismiss (Doc. 50).

## II.   LEGAL STANDARD

An indictment is "a plain, concise, and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c)(1). At any time, a defendant may move to dismiss an indictment on the ground that the Court lacks jurisdiction. *See* FED. R. CRIM. P. 12(b)(2). "Under FED. R. CRIM. P. 12(b) an indictment may be dismissed where there is an infirmity of law in the prosecution; a court may not dismiss an

indictment, however, on a determination of facts that should have been developed at trial."

*United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987).

## III.   ANALYSIS

The MDLEA directs that a vessel is "subject to the jurisdiction of the United States" if it is "without nationality." 46 U.S.C. § 70502(c)(1)(A). Under § 70502(d)(1)(C), a vessel is "without nationality" if "the master or individual in charge makes a claim of registry" but "the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." Here, Payba Lacayo identified himself as the master of the vessel and claimed that the vessel was of Costa Rican nationality, but Costa Rica did not affirmatively and unequivocally confirm that the vessel was of its nationality. *See* Certification of Commander Starr ¶¶ 4–6. Thus, the United States asserts jurisdiction to prosecute Payba Lacayo for drug trafficking because he was aboard what the MDLEA defines as a stateless vessel.

In his motion to dismiss, Payba Lacayo challenges Congress's authority to enact and prosecute him under the MDLEA, both facially and as-applied. Congress enacted the MDLEA through its power under Article I, § 8, Clause 10, *see United States v. Hernandez*, 864 F.3d 1292, 1303 (11th Cir. 2017), which states in full:

> The Congress shall have Power . . . To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations; . . .

Clause 10, commonly known as the Define and Punish Clause, contains three sub-clauses:

The Piracies Clause, the Felonies Clause, and the Offences Clause. *See United States v.*

*Bellaizac-Hurtado*, 700 F.3d 1245, 1257 (11th Cir. 2012) (drawing this distinction).

Congress relied on its Felonies Clause power to enact the MDLEA, but all three clauses

are relevant in explaining why Payba Lacyo's challenges fail.

### A. Payba Lacayo's Facial Challenge Fails

Payba Lacayo argues that § 70502(d)(1)(C) is facially unconstitutional because it

exceeds Congress's Felonies Clause authority. *See* Second Am. Mot. to Dismiss at 9–21.

His facial attack borrows extensively from the First Circuit's now-withdrawn decision in

*United States v. Davila-Reyes*, 23 F.4th 153 (1st Cir. 2022), *reh'g en banc granted, opinion*

*withdrawn*, 38 F.4th 288 (1st Cir. 2022), where it held that "Congress exceeded its

authority under Article I of the Constitution in enacting § 70502(d)(1)(C) of the

MDLEA." *Id.* at 157–58. The *Davila-Reyes* panel reached its conclusion based on two

premises: (1) that Congress's power under the Felonies Clause is cabined by international

law and (2) that § 70502(d)(1)(C) defines vessels as stateless and subject to the United

States' jurisdiction when they are not stateless under international law. *See id.* at 173–95.

Payba Lacayo repeats that reasoning and argues that § 70502(d)(1)(C) is facially

unconstitutional as a result. Second Am. Mot. to Dismiss at 9–21. Payba Lacayo's facial

challenge fails because both premises of the now-withdrawn *Davila-Reyes* decision are incorrect.

First, Congress's power to enact laws under the Felonies Clause is not limited by international law. Beginning with the text, the Define and Punish Clause suggests that Congress's power under the Felonies Clause need not comport with international law. The Define and Punish Clause gives Congress the power to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. CONST. art. I, § 8, cl. 10. Normal English usage indicates that "committed on the high seas" modifies the scope of felonies that Congress may define and punish and that "against the Law of Nations" modifies the scope of other offenses that Congress may define and punish. *Cf. Bellaizac-Hurtado*, 700 F.3d at 1249–51. As evidence, the comma separates the two phrases—but notably not the Piracies Clause and the Felonies Clause—and "against the Law of Nations" hardly seems a series qualifier for the earlier two clauses, particularly when not set off to indicate it should apply backwards to all previous clauses. Instead, "against the Law of Nations" might be the quintessential example of the "rule" of the last antecedent—to the extent that idea simply embodies good syntax. *See United States v. Macias*, 654 F. App'x 458, 461 (11th Cir. 2016) (per curiam) ("[U]nlike the Offences Clause, the Felonies Clause is not narrowed by the language against the Laws of Nations.") (quotation omitted).

6

The drafting history of the Define and Punish Clause confirms this reading. When the Define and Punish Clause was originally drafted, it did not include the word "define." *See* 2 JAMES MADISON, RECORDS OF THE FEDERAL CONVENTION OF 1787 316 (Max Farrand, ed. 1911) ("MADISON, RECORDS OF THE CONVENTION"). The word was inserted after James Madison and Edmund Randolph moved to include it so that Congress would have the authority to define—not just punish—felonies on the high seas. *Id.* James Wilson initially argued that this addition was unnecessary because the word "felonies" was sufficiently defined by the common law. *Id.* Madison disagreed, noting that the term "felonies" was vague under the common law. *Id.* Madison also argued that "no foreign law" should govern the meaning of a "felony" committed on the high seas. *Id.* Instead, he concluded that "[t]he proper remedy . . . was to vest the power proposed by the term 'define' in the [national] legislature." *Id.* Shortly after this colloquy, the Convention unanimously approved Madison and Randolph's motion to give Congress—not "foreign law"—the power to define felonies committed on the high seas. *Id.*

A little less than a month later, the convention altered the Define and Punish clause once again. MADISON, RECORDS OF THE CONVENTION, at 614–15. Before the amendment, the proposed clause gave Congress the power to "define and punish felonies on the high seas, and *punish* offences against the law of nations." *Id.* at 614 (emphasis added) (quotation marks removed). Gouverneur Morris moved to strike the word "punish"

7

from the Offences Clause so that offenses would "be *definable* as well as punishable, by

virtue of the preceding member of the sentence." *Id.* James Wilson claimed that Morris's

motion was unnecessary, arguing that international law would adequately delineate offenses

against the law of nations. *Id.* at 615. He explained, "To pretend to *define* the law of

nations which depended on the authority of all the Civilized Nations of the World, would

have a look of arrogance." *Id.* Yet Morris retorted that the word "define" was appropriate

because the law of nations was "often too vague and deficient to be a rule."[1] *Id.* The motion

was ultimately approved by a narrow margin of six "ayes" and five "noes." *Id.*

These debates suggest that the Felonies Clause and the Offenses Clause—as

originally understood—are separate. When Madison and Randolph moved to give

Congress the authority to define felonies on the high seas, no one at the convention claimed

that Congress was required to define "felonies" according to international law. In fact, the

Convention unanimously agreed to the exact opposite—that Congress should have the

authority to define felonies on the high seas because "no foreign law should be a standard."

MADISON, RECORDS OF THE CONVENTION at 316. Conversely, when Morris and

Wilson debated whether to give Congress the authority to define "offences committed

against the law of nations," they understood these words to mean that Congress would be

---

[1] As the Eleventh Circuit has explained, "the word 'define' would not have been understood to grant Congress the power to create or declare offenses against the law of nations, but instead to codify and explain offenses that had already been understood as offenses against the law of nations." *Bellaizac-Hurtado*, 700 F.3d at 1250.

required to define offenses according to "the law of nations." *See id.* at 614–15. The debate was merely over whether it was necessary to give Congress the power to define these offenses, since the law of nations might supply the answer on its own. *Id.* In short, the Convention's history confirms that Congress's authority to define "Felonies committed on the high Seas" is not cabined by international law. U.S. CONST. art I, § 8, cl. 10.

Eleventh Circuit precedent, although it has yet to address this precise issue, likewise implies that international law does not constrain the Felonies Clause. In *Bellaizac–Hurtado*, the Eleventh Circuit held that the MDLEA unconstitutionally proscribed drug trafficking in the territorial waters of Panama because drug trafficking is not an "Offence" "against the Law of Nations." 700 F.3d at 1247. The Court reasoned that "[t]he power granted to Congress in the Offences Clause is limited by customary international law," though it declined to decide whether that power has been affected by the evolution of customary international law since the founding because drug trafficking was not a violation of customary international law at the time of the founding or when the case was decided. *Id.* at 1249–58. But the Court reaffirmed, "we have always upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies Clause." *Id.* at 1257. Further, although *Bellaizac–Hurtado* held that the Offences Clause is limited by customary international law, the Court never conditioned the Piracies Clause or the Felonies Clause similarly. Instead, it explained that neither of those clauses were

9

implicated in *Bellaizac-Hurtado* because "piracy is, by definition, robbery on the high seas, and the Felonies Clause is textually limited to conduct on the high seas." *Id.* at 1248 (citations omitted). This reasoning makes little sense, however, if the entire Define and Punish Clause is limited by customary international law, as the *Davila-Reyes* panel ruled.

After *Bellaizac-Hurtado*, the Eleventh Circuit reaffirmed Congress's power to prohibit drug trafficking under the Felonies Clause. *United States v. Campbell*, 743 F.3d 802, 809–12 (11th Cir. 2014). In *Campbell*, three drug traffickers were arrested on a stateless vessel in international waters. *Id.* at 804. One of the defendants argued that "Congress exceeded its authority under the Felonies Clause when it enacted the [MDLEA] because his drug trafficking offense lacked any nexus to the United States and because drug trafficking was not a capital offense during the Founding era." *Id.* at 804, 809–10. The Eleventh Circuit rejected the defendant's constitutional challenge because "[t]he Felonies Clause empowers Congress to punish crimes committed on the high seas." *Id.* at 810. The Court explained:

> We have always upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies Clause. And we have long upheld the authority of Congress to *extend the criminal jurisdiction of this country* to *any* stateless vessel in international waters engaged in the distribution of controlled substances. Moreover, in *United States v. Estupinan,* we rejected an argument that Congress exceeded its authority under the Piracies and Felonies Clause in enacting the Maritime Drug Law Enforcement Act. . . . Congress also may assert extraterritorial jurisdiction because the law places *no restrictions* upon a nation's right to subject stateless vessels to its jurisdiction.

*Id.* (emphasis added) (citations, quotations, and brackets omitted). *Campbell* never identified an international-law limitation for the Felonies Clause that corresponded with the limitation for the Offences Clause. *Compare Campbell*, 743 F.3d at 809–12, *with Bellaizac-Hurtado*, 700 F.3d at 1248–53. Instead, *Campbell* affirmed that Congress has broad authority under the Felonies Clause to proscribe drug trafficking. *Campbell*, 743 F.3d at 809–12. Read together, *Campbell* and *Bellaizac-Hurtado* make clear that Congress's Felonies Clause authority is not constrained by international law.

But even if the first premise of *Davila-Reyes* is true (that the Felonies Clause is limited by international law), neither Payba Lacayo nor the *Davila-Reyes* panel demonstrate that § 70502(d)(1)(C) conflicts with international law. Payba Lacayo cites *Davila-Reyes* for the proposition that " '[i]nternational law recognizes that an oral claim by the vessel's master constitutes prima facie proof of the vessel's nationality.' " Second Am. Mot. to Dismiss at 17 (quoting *Davila-Reyes*, 23 F.4th at 186). Payba Lacayo continues, "Section 70502(d)(1)(C), however, . . . 'allows a vessel to be treated as stateless where there is a claim of nationality recognized by international law but the identified country neither confirms nor denies that claim.' " *Id.* (quoting 23 F.4th at 187).

But Payba Lacayo does not cite any source (other than *Davila-Reyes*) for the proposition that international law recognizes an oral claim by the master of a vessel as "prima facie proof" of the vessel's nationality. *Davila-Reyes*, in turn, does not cite any

11

primary, international-law source to support this proposition either. *See* 23 F.4th at 183–86 (citing *United States v. Matos-Luchi*, 627 F.3d 1, 5 (1st Cir. 2010); *United States v. Aybar-Ulloa*, 987 F.3d 1, 5 (1st Cir. 2021); *United States v. Obando*, 891 F.3d 929, 939 (11th Cir. 2018) (Black, J., concurring); *United States v. The Little Charles*, 26 F. Cas. 979, 982 (Marshall, Circuit Justice, D. Va. 1818) (No. 15,612); Andrew W. Anderson, *Jurisdiction over Stateless Vessels on the High Seas: an Appraisal Under Domestic and International Law*, 13 J. MAR. L. & COM. 323, 341 (1982)). More surprisingly, a careful reading of the sources that *Davila-Reyes* cites reveals that none aver that international law recognizes an oral claim by the master of a vessel as "prima facie proof" of the vessel's nationality. *See Matos-Luchi*, 627 F.3d at 5; *Aybar-Ulloa*, 987 F.3d at 5; *Obando*, 891 F.3d at 939 (Black, J., concurring); *The Little Charles*, 26 F. Cas. at 982; Anderson, *supra*, at 341.

Thus, even if the Felonies Clause is cabined by international law, Payba Lacayo fails to prove that § 70502(d)(1)(C) conflicts with international law. *See also United States v. Pierre*, No. 21-cr-20450, 2022 WL 3042244, at *16 (S.D. Fla. Aug. 1, 2022) (Altman, J.) ("[T]he First Circuit never actually identified a rule of international law that conflicts with § 70502(d)(1)(C)."). Section 70502(d)(1)(C) is facially constitutional.

### B. Payba Lacayo's As-Applied Challenge Fails

Payba Lacayo argues that the United States cannot exercise jurisdiction over his particular vessel because he was not arrested on the "high Seas." Second Am. Mot. to Dismiss at 3–9. Payba Lacayo was arrested 135 nautical miles northwest of Isla de Malpelo, Colombia, Second Am. Mot. to Dismiss at 2, and this section of the ocean is part of Colombia's Exclusive Economic Zone (EEZ) under Articles 55 and 57 of the 1982 United Nations Convention on the Law of the Seas (UNCLOS), Dec. 10, 1982, 21 I.L.M. 1245. Additionally, 33 C.F.R. § 2.32(d), states, "Under customary international law as reflected in the 1982 United Nations Convention on the Law of the Sea . . . and unless the context clearly requires otherwise . . . the high seas means waters that are not the exclusive economic zone." Because Payba Lacayo was not arrested on the "high seas" under the definition provided by § 2.32(d), he argues that he was not arrested on the "high Seas" under the Felonies Clause. Second Am. Mot. to Dismiss at 3–9.

Payba Lacayo's as-applied challenge fails for three reasons. First, Payba Lacayo incorrectly presumes that customary international law determines the definition of "high Seas" under the Felonies Clause. He bases his as-applied challenge entirely on definitions from UNCLOS and federal regulations enforcing UNCLOS. *See* Second Am. Mot. to Dismiss at 3–9. But neither international law nor federal regulation control how federal courts interpret the Felonies Clause. As already explained, Congress's Felonies Clause

power is not limited by international law. Furthermore, Article III courts are not bound by agency interpretations of the Constitution. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

Second, Payba Lacayo was apprehended on the "high Seas" as the term is used in the Felonies Clause. Payba Lacayo and his co-defendants were arrested 135 miles off the coast of Colombia. Second Am. Mot. to Dismiss at 2. Although the Eleventh Circuit has never precisely delineated the boundaries of the "high Seas" under the Felonies Clause, *Bellaizac-Hurtado* implied that the "high Seas" are beyond a sovereign nation's territorial seas. 700 F.3d at 1247–48. Although the outer boundaries of the territorial seas and the beginning of the high seas has been subject to some debate, no court, statute, or other source has opined that the "high Seas"—as the term is used under the Felonies Clause— includes all waters within a nation's EEZ. *See United States v. Rodgers*, 150 U.S. 249, 254–55 (1893) ("The term 'high seas' does not, in either case, indicate any separate and distinct body of water, but only the open waters of the sea or ocean, as distinguished from ports and havens and waters within narrow headlands on the coast."); *The Manila Prize Cases*, 188 U.S. 254, 271 (1903) ("[T]he high seas include coast waters without the boundaries of low-water mark, though within bays or roadsteads,—waters on which a court of admiralty has jurisdiction."); 3 JOSEPH STORY, COMMENTARIES ON THE

14

CONSTITUTION § 1159 (1833) ("The phrase ['high Seas'] embraces not only the waters of the ocean, which are out of sight of land, but the waters on the sea coast below low water mark, whether within the territorial boundaries of a foreign nation, or of a domestic state."); WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES 107 (2d ed. 1829) ("By the high seas we are to understand not only the ocean out of sight of land, but waters on the sea coast beyond the boundaries of low water mark, although in a roadstead or bay, within the jurisdiction or limits of one of the states or of a foreign government."). Furthermore, no court or persuasive source has ever held that a nation's territorial seas include waters 135 miles off its coastline. *See United States v. McPhee*, 336 F.3d 1269, 1273 (11th Cir. 2003) ("The United States generally recognizes the territorial seas of foreign nations up to twelve nautical miles adjacent to recognized foreign coasts."); THOMAS WEMYSS FULTON, THE SOVEREIGNTY OF THE SEA 563–64, 572–74 (1911), at https://perma.cc/9GRZ-TKT7 (explaining that in the late 18th century, the limit of the territorial seas was the maximum range of a cannon shot—roughly three miles—and that the United States asserted this boundary as its line of territorial protection when war broke out between England and France in 1793).

Finally, even if the meaning of "high Seas" is confined by modern international law and federal regulations, Payba Lacayo's as-applied challenge would fail. Payba Lacayo contends that he was not arrested on the "high Seas" because he was apprehended in

Colombia's EEZ. Second Am. Mot. to Dismiss at 3–9. Under modern international law, the EEZ is not the high seas for economic and conservation purposes. But for law enforcement purposes, the high seas includes any ocean beyond 12 nautical-miles off the coast of a nation. *See United States v. Beyle*, 782 F.3d 159, 167 (4th Cir. 2015) (explaining that the "EEZ bordering a particular nation's territorial sea is merely a part of the high seas where that nation has special economic rights and jurisdiction"); *see also* Ryan R. Babb, Note, *Foreign Territorial Sea-Zures: Article I Supports the Application of the Maritime Drug Law Enforcement Act to Drug Trafficking Within Foreign Territorial Seas*, 74 FLA. L. REV. 345, 354 (2022) ("In the exclusive economic zone (EEZ), . . . the coastal nation only has sovereign rights over natural resources." (citing arts. 56–57, UNCLOS, 21 I.L.M. at 1280)). Additionally, UNCLOS says that all countries have a "right to establish the breadth of its territorial sea up to a limit *not exceeding 12 nautical miles*, measured from baselines determined in accordance with this Convention." Part II § 2, Art. 3 21 I.L.M. at 1272. And the "high seas" consists of "all parts of the sea that are not included in the territorial sea or in the internal waters of a State." 1958 Geneva Convention on the High Seas, Convention on the High Seas art. 1, *opened for signature* Apr. 29, 1958, 450 U.N.T.S. 82.

U.S. federal regulation also distinguishes between the "high seas" for law enforcement purposes and the "high seas" economic purposes. Payba Lacayo cites 33

16

C.F.R. § 2.32(d), which provides, "Under customary international law as reflected in the 1982 United Nations Convention on the Law of the Sea. . . and unless the context clearly requires otherwise . . . the high seas means waters that are not the exclusive economic zone." Yet § 2.32(c) says that in cases involving—among other things—law enforcement activities by the Coast Guard, the "high seas *includes* the exclusive economic zones of the United States and other nations, as well as those waters that are seaward of territorial seas of the United States and other nations." *Id.* at § 2.32(c) (emphasis added); 14 U.S.C. § 522 ("The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas . . ."). Because Defendants were apprehended more than twelve nautical miles off the coast of Colombia, Second Am. Mot. to Dismiss at 2, they were arrested on the "high seas" as defined under international law and federal regulation.

Overall, Payba Lacayo's as-applied challenge fails because the meaning of "high Seas" is not limited by modern international law and Payba Lacayo was arrested on the "high Seas" as the term is used in the Felonies Clause. Further, even if the boundaries of the "high Seas" are constrained by modern international law, Columbia's EEZ is part of the high seas for purposes of the Coast Guard's enforcement of the MDLEA against drug traffickers on stateless vessels.

## IV.   CONCLUSION

Accordingly, Payba Lacayo's Motion to Dismiss, (Doc. 47), is **DENIED**.

17

ORDERED in Tampa, Florida, on September 19, 2023.

Kathryn Kimball Mizelle
United States District Judge